IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFERY W. MILINICH, ) <br> ) <br> Petitioner, ) <br> ) <br> vs. ) <br> ) <br> TOM VOSS, Executive Director, California ) <br> Department of Mental Health, ) <br> ) <br> Respondent. ) <br> ) | No. C 06-1015 CRB (PR) <br><br> ORDER DENYING PETITION <br> FOR A WRIT OF HABEAS <br> CORPUS |

On March 17, 2004, a jury in the Superior Court of the State of California in and for the County of Santa Clara found petitioner to be a sexually violent predator ("SVP") under the Sexually Violent Predators Act, Cal. Welf. & Inst. Code § 6600 ("SVPA"), and the trial court civilly committed him to the Department of Mental Health ("DMH") for a period of two years.

On September 23, 2004, the California Court of Appeal affirmed the commitment order, rejecting petitioner's claim that the trial court erred in its jury instructions, and on December 14, 2005, the California Supreme Court denied review.

On February 14, 2006, petitioner filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254. On July 5, 2006, this court found that petitioner's instructional error claim appeared cognizable under § 2254, and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent has filed an answer to the court's order, and petitioner has filed a traverse.

## BACKGROUND

The California Court of Appeal summarized the factual and procedural background of the case as follows:

### *Defendant's Prior Sex Offenses*

In 1985, defendant pleaded no contest to two counts of lewd and lascivious acts on the victim, Heather, then age 13. He served a three-year prison sentence. Defendant testified that he met Heather when she was eight years old and he was 19 or 20. She was the sister of a friend, and the friend's mother often asked defendant to keep an eye on her. Eventually, he moved into an apartment in the family's garage and lived there for a year or so. He admitted that he began fondling Heather sexually toward the end of the first year he met her, and over the next six years he fondled or orally copulated her 50 to 100 times.

According to the probation report, the counts to which defendant pleaded guilty related to two discrete incidents. On December 11, 1984, defendant picked Heather up from her job, drove her to a school parking lot and orally copulated her for 10 minutes. On January 10, 1985, defendant went into Heather's room where she was sleeping, asked her if he was going to get his birthday present that night, and then inserted his fingers in her vagina.

In 1991, he pleaded guilty to two counts of forcible lewd and lascivious conduct with Christina, then age five, and to inflicting great bodily injury on her. He was sentenced to prison for 22 years. Defendant testified that in 1991 he was introduced to a couple and their three children. After he had known the family for about nine months, the children's mother asked him if he would baby-sit the children for about half an hour, until her husband came home from work. He admitted that on two occasions he molested Christina, attempting to insert his penis into her vagina at least once.

According to the probation report, Christina told her aunt that on two days when her grandmother and her aunt were on vacation and her mother was at work, defendant played a "game" called "sex" with her in which he "unzipped his zipper and took it out" and then got on top of her. Christina told the police that defendant removed her cloths, laid on top of her on the floor, put his "thing" between her legs and started moving up and down. Christina said it hurt and told defendant to stop. She later found blood on her underpants. Evidence of vaginal trauma was noted during an examination, conducted at Valley Medical Center. Christina's mother identified the two dates on which defendant baby-sat as February 18, and 20, 1991.

The 1991 probation report also referred to a March 1991 San Jose police report identifying defendant as a suspect in the molestations of D.U. and Crystal A. D.U. reported that defendant, a friend of her brother, started molesting her in 1978 when she was eight years old and he was 18 or 19.

The molestations, which started out as fondling and developed into oral copulation and at least two attempts at intercourse, continued until D.U. was 12 years old in 1982. According to D.U., defendant referred to the acts as a "sex game."

Crystal A. is D.U.'s niece. In 1991, Crystal's mother reported that Crystal, who was then five years old, had redness or a rash in her vaginal area and often complained that her "pee-pee" hurt. Defendant had access to Crystal and would bring her candy and toys until just before his 1991 arrest. When Crystal was questioned by police she admitted that she had heard of the "sex game," but not from defendant. She denied having sexual contact with defendant, but the investigating officer believed she was hiding something.

Defendant testified that during the same time he was involved with Heather, he also knew D.U. and her family; they lived around the corner from Heather. Defendant denied any sexual activity with D.U. or Crystal.

*Commitment Proceedings*

In April of 2002, the Santa Clara County District Attorney filed a petition to commit defendant as a sexually violent predator. After a hearing held in October of 2002, the court found probable cause to believe that as a result of a diagnosed mental disorder, defendant was likely to engage in sexually predatory behavior if released from custody, and bound him over for trial. Trial by jury commenced in March 2004 and concluded with a verdict finding that defendant was a sexually violent predator. Accordingly, the court ordered defendant committed to a secure facility for two years starting March 17, 2004 . . . .

*Trial Testimony*

In its case in chief, the prosecution called two licensed psychologists who have been SVP evaluators for the DMH since 1996, Dr. John Hupka and Dr. Dana Putnam. Defendant called Dr. John Podboy, Ph.D., a clinical psychologist, five lay witnesses, and testified on his own behalf. In rebuttal, the prosecution called D.U.

Drs. Hupka and Putnam reviewed defendant's medical, psychiatric and central prison files from Avenal State Prison, as well as a packet of information from DMH, and evaluated defendant's mental condition. In Dr. Hupka's opinion, defendant has two psychiatric diagnoses: pedophilia, with attraction to females; and a mixed personality disorder, with features of "dependency, inaccuracies [and] social withdrawal." He further opined that defendant's pedophilia predisposed him to the commission of future criminal predatory sexual acts, and that given his history, defendant's pedophilia was "chronic" and not likely to "go away."

Dr. Hupka also administered the Static 99, an actuarial instrument used to measure a person's risk of reoffense, and the Hare Psychopathy Checklist. Defendant's Static 99 test results placed him in a category of offenders with a 36 percent likelihood of being rearrested or reconvicted of

3

an offense, and an even higher likelihood of reoffending without getting caught, within 15 years. He scored low to very low on the Hare Checklist, which demonstrated that he is not a psychopath: "he has a conscience." In addition, Dr. Hupka identified several risk factors that placed defendant at high risk to reoffend, some neutral factors, and several more factors that indicated a decreased risk of reoffense, but he concluded that treating defendant outside of a custodial setting would not "reduce his risk to reoffend."

In Dr. Hupka's view, the best predictor of defendant's future behavior if released is his past behavior. Based on his past behavior, Dr. Hupka expected that if defendant were released, he might remain crime free for as long as five years, but eventually he would reoffend.

Dr. Hupka considered defendant "amenable to the right form of treatment." In his opinion, defendant needed compulsory treatment in a custodial setting, and he believed defendant would fail if he were released into the community to seek his own treatment. He noted that defendant had sought out treatment voluntarily between his release from his first prison sentence and his re-imprisonment in 1991, and that community-based treatment had not prevented defendant from reoffending. He needed something more intensive than what a Parents United program could provide. Dr. Hupka felt that defendant did not appreciate how intensive, long-term and expensive the treatment he needed really was.

Dr. Putnam also concluded defendant had a diagnosis of pedophilia. He found a number of factors that suggested defendant did not pose a serious risk of reoffending. For example, defendant said he would be willing to take anti-androgens to reduce his sex drive. Like Dr. Hupka, Dr. Putnam also found that defendant did not have an antisocial personality. Dr. Putnam noted that if defendant were released, he could work and, with money he had saved, could pay something toward outpatient treatment. With his cooperative nature, defendant probably could do well in a treatment program, and he did have some social support in the community.

However, Dr. Putnam felt that these positive factors were outweighed by the negatives. The combination of defendant's history of previous arrests, convictions, prison sentences and failed treatment, his "entrenched" sexual behavior patterns, his intimacy deficits, lack of emotional and sexual controls and past depression, and defendant's moderate to high risk score for reoffending on the Static 99 test, convinced Dr. Putnam that defendant posed a serious, substantial and well-founded risk of reoffending during his lifetime if he were to be released. Indeed, Dr. Putnam opined that even if defendant participated in an outpatient treatment program, he presented a substantial risk of committing a predatory sexual offense against a young girl, given that defendant had a history of seeking out children, and promoting his relationships with them by giving them gifts, for the purpose of later victimizing them.

Dr. Podboy had done 50 or 60 evaluations in SVP cases, and reviewed reports by Drs. Hupka and Putnam, among others, before evaluating defendant. Dr. Podboy agreed that defendant was properly

4

classified as a pedophile in 1985 and 1991, but opined that he was not currently mentally ill. Specifically, defendant could not currently be classified as a pedophile because he did not currently exhibit the symptoms of pedophilia. Dr. Podboy opined that defendant likely had a "courtship disorder" with regard to Heather, his first love and sexual partner.

Dr. Podboy believed that the Static 99 test had no scientific value as a predictor of sexual behavior and therefore he did not use it with defendant. He did not use the Hare Psychopathy Checklist with defendant because defendant did not exhibit any of the gross indicators that would warrant employing it. In Dr. Podboy's view, the best indicator of how individuals could be expected to function over time was how they conducted themselves "over time subsequent to their arrest and incarceration for a sex offense." In this regard, he noted that defendant had received glowing reports about his conduct in prison.

Further, Dr. Podboy opined that defendant was unusual among sex offenders in that he expressed remorse and had developed a sense of empathy with his victims from having experienced what it was like to be a child molester in prison for 14 years. Dr. Podboy considered it "very positive" that defendant had not been symptomatic for several years and sincerely wanted to make amends for his past misconduct.

As a result of the foregoing, Dr. Podboy was of the opinion that defendant was going to need some help with transitioning from the "very bizarre controlled world" of prison to " a world in the community," but that he foresaw this treatment would not need to last for "that long." He expected that "in short order" defendant would be able to move from formal treatment "into relying upon a support group, family and friends" and he hoped that within a short time defendant would be able to find a support group. He believed that defendant was amenable to voluntary treatment without custody. While he thought the cost of community treatment would present defendant with a financial challenge, he did not think it would be impossible for appellant to afford.

Several friends of defendant testified on his behalf. Husband and wife, Peggy and Michael Steinway, Sharon Webster and her children, Patrick Webster and Melisa Madrid, all testified that defendant was trustworthy and had acted appropriately around them, their own children and other people's children.

Parole Officer Susan Morris testified about the conditions of parole and level of supervision defendant would receive in the Fairfield unit to which defendant would be assigned if and when he were released. She said that the supervision of sex offenders was more intensive than the supervision of other parolees, and that sex offender parolees were seen once a month by medical staff. She said that she was unaware of any state funded sex offender programs for sex offenders in Fairfield, but that parolees could fund their own treatment programs. She also said that defendant's parole would terminate on May 25, 2005, and that after that, defendant would be free to go where he pleased.

5

As noted, defendant admitted his crimes against Heather and Christina, but denied any sexual misconduct with D.U. and Crystal.

With respect to his amenability to community-based treatment, defendant testified about his history of seeking treatment. In 1984, he went to a psychic for hypnosis to help him get over his addiction to Heather. It made him feel better, but "the love feeling was still there." For the six months before defendant was sentenced on the 1985 offenses and while he was free on his own recognizance, defendant engaged in once weekly, one-on-one psychological counseling as well as group therapy through Parents United. He was forced to drop out when he was sentenced to state prison.

During his 13-month parole in 1987, he was required to attend a monthly one-hour session with a psychologist. He would have liked to get back into the Parents United program, but he could not afford it.

As of his SVP trial in 2004, defendant had been in custody for 13 years, since 1991. He did not think he had a mental disorder and he did not prefer sex with children to sex with women. He explained that in trying to understand why he had taken advantage of the children, he had concluded that with Heather, he enjoyed being around her and he saw her as a partner. With Christina, "it just happened." He was going through a bad time in his life. In 1991 he was under a lot of stress.

While in prison he had decided to change his life and realized he could only do so with treatment. He began working and saving his money so he could pay for a treatment program when he got out of prison. He had saved $ 2,548 and had some stocks. He thought he could support himself and pay for treatment with the wages he could earn as a skilled mechanic, baker and painter. He recognized that he would have to learn to live a "therapeutic life." He thought he needed to get into relationship counseling to learn how to meet girls his own age and get comfortable around them. At the time of trial, he was 44 years old. He felt that in community-based treatment he would grow and learn to understand himself. He felt he could learn more from treatment in the community, where someone is "going to be normally," than from treatment in a hospital, where there are no women and children around.

On rebuttal, D.U., who was 34 years old at the time of trial, testified that defendant repeatedly molested her from the time she was seven until she was 11. She said the acts mainly consisted of fondling and oral sex, but that he twice tried to have intercourse with her and it was very painful. At that time, defendant had befriended D.U.'s mother and was very helpful to her. D.U. reported the molestation for the first time in 1991 when she was 21 or 22 years old. At the time, D.U. had just learned that her stepfather had molested her younger sister and that, coincidentally, defendant had also been arrested. Her therapist convinced her to tell the police about defendant.

People v. Milinich, No. H027260, 2005 Cal. App. Unpub. LEXIS 8661, at **2-14 (Cal. Ct. App. Sept. 23, 2005).

6

**DISCUSSION**

**A.     Standard of Review**

This court may entertain a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law

may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

**B.     Claims & Analysis**

Petitioner claims that the trial court's modification of CALJIC No. 4.19 on the question of his amenability to treatment, and how evidence of his amenability to voluntary treatment in the community relates to the jury's decision whether he should be committed as an SVP, violated his right to due process.

CALJIC No. 4.19 closely tracks SVPA's statutory language and encompasses every aspect of the jury's determination at an SVPA trial. In petitioner's case, CALJIC No. 4.19 informed the jury that "the term 'sexually violent predator' means a person who, one, has been convicted of a sexually violent offense against two or more victims, and two, has a diagnosed mental disorder that makes him a danger to the health and safety of others in that it is likely that he will engage in sexually violent predatory criminal behavior." Because petitioner presented some evidence that he was willing to undergo voluntary community treatment for his sexually violent tendencies, the trial court also instructed the jury on the relevance of amenability to voluntary treatment to the question whether a diagnosed mental disorder makes an individual a danger to the health and safety of others in that it is likely that he will engage in sexually violent criminal behavior. The trial court specifically instructed:

> *Amenability to treatment is not required for a finding that any person is a sexually violent predator, nor is it required for treatment of that person.* Treatment does not mean that the treatment be successful or potentially successful, nor does it mean that the person must recognize his problem and willingly participate in the treatment program. *You must also consider any evidence of Mr. Milinich's amenability to voluntary treatment, that is without custody, in determining whether Mr. Milinich poses a serious and well-founded risk of committing sexually violent predatory criminal acts upon release*.

Rep. Tr. at 493 (italics added).

8

1  Petitioner claims that the italicized language was ambiguous and misleading.  He
2 argues that the term "amenability" as used in the first sentence of the passage cited above
3 has a different meaning from the term as used in the last sentence of the passage.
4 According the petitioner, as used in the first sentence, the term "amenability to treatment"
5 has nothing to do with a person's willingness to undergo mental health treatment but
6 rather means not capable of being cured.  On the other hand, he contends that as used in
7 the last sentence, the term "amenability to voluntary treatment" does not mean the person
8 was capable of being cured but instead means that the person would voluntarily seek
9 treatment in the community and consequently would not pose an unacceptable risk.
10 Petitioner also argues that the modified instruction impermissibly instructed the jurors
11 that petitioner could be involuntarily committed to the DMH even if they believed that he
12 was amenable to voluntary treatment in the community.  According to petitioner, a person
13 must be released if he is amenable to treatment in the sense that he would voluntarily seek
14 treatment and consequently not pose an unacceptable risk to the community.

15  Petitioner also claims that the instructions relieved the state of its burden of
16 proving by clear and convincing evidence that he would pose an unacceptable risk to the
17 community despite his willingness to seek treatment on his own, and that he suffered
18 from a mental disorder that caused him to be an unacceptable risk to the community.

19  1.  <u>Ambiguous and misleading instruction claim</u>

20  To obtain federal habeas relief for error in the jury instruction, petitioner
21 must show that the error "so infected the entire trial that the resulting conviction violates
22 due process."  <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991).  "The error may not be judged
23 in artificial isolation, but must be considered in the context of the instructions as a whole
24 and the trial record."  <u>Id.</u>

25  Where an ambiguous or potentially defective instruction is at issue, the court must
26 inquire whether there is a "reasonable likelihood" that the jury has applied the challenged

9

instruction in a way that violates the Constitution. Id. at 72 & n.4; Boyde v. California, 494 U.S. 370, 380 (1990). However, a determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that a constitutional error has occurred. Calderon v. Coleman, 525 U.S. 141, 146 (1998). If constitutional error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict before granting habeas relief. Id. (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

The California Court of Appeal rejected petitioner's claim that the challenged instruction was ambiguous and misleading on the ground that "there is no 'reasonable likelihood that the jury [] applied the challenged instruction in a way that violates the Constitution' or California law." People v. Milinich, 2005 Cal. App. Unpub. LEXIS 8661, at *26 (citing Estelle v. McGuire, 502 U.S. at 72, and state cases).

The court found no ambiguity in the two sentences of the challenged instruction, noting that amenability to treatment simply means that despite his illness, the potential SVP is willing and able to pursue treatment voluntarily. Id. at *22.

> Thus, the court's instruction says, in effect, that a person's <u>willingness and ability</u> to submit to treatment need not be proven before that person can be found to be an SVP, but his or her <u>willingness and ability</u> to submit to voluntary treatment, if freed, <u>is</u> relevant to the jury's determination whether a person poses a serious and well-founded risk – that is, an unacceptable risk – of reoffense.

Id. (emphasis in original).

The court also found that the challenged instruction was "a correct statement of the law," and was not misleading. Id. at *26. The court also explained that California case law makes clear that "a person's amenability to voluntary treatment is one factor, among many, that the jury must consider in determining whether the alleged SVP presents a substantial danger, that is, a serious and well-founded risk, of committing a sexually violent predatory crime if released from custody." Id. at *25. Nothing in the case law

10

1  "suggests that amenability to voluntary treatment is the sine qua non of an acceptably low

2  risk of reoffense." Id.

> [W]e see no reasonable likelihood that the jury would have had difficulty understanding that a person can be committed as an SVP even if he is not amenable to treatment and even if treatment cannot cure him. In our view, this [first] sentence [of the challenged instruction] did not cancel out the last sentence. Instead, the two sentences together told the jury that a person's non-amenability to treatment did not prevent them from finding that the person should be required to undergo treatment in a custodial setting, but that his or her amenability to voluntary treatment was a factor that must be considered in determining whether the person could be safely released from custody to be treated in a community setting. As such, the instruction was correct and was not misleading. No error occurred.

Id. at *27.

The California Court of Appeal's rejection of petitioner's claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Both sentences in the challenged instruction were correct statements of the law. The first sentence correctly informed the jury that amenability to treatment was not a prerequisite for finding that petitioner qualified for commitment as an SVP. Cf. Kansas v. Hendricks, 521 U.S. 346, 365-69 (1997) (amenability to treatment is not a prerequisite finding for determination that person qualifies for commitment as SVP). And the third sentence correctly informed the jury that it was required to give consideration to petitioner's amenability to voluntary treatment in the community in determining the likelihood of reoffense. Cf. Kansas v. Crane, 534 U.S. 407, 413 (2005) (holding that commitment as SVP requires proof of serious difficulty in controlling behavior suggests that jury should hear evidence that, with community-based treatment, person may be able to control his behavior). There is no indication of a reasonable likelihood that the jury applied either sentence in a way that violated petitioner's due process rights. See McGuire, 502 U.S. at 72. The state court reasonably concluded that the challenged instruction was a correct statement of law that had no reasonable likelihood of misleading

11

the jury into thinking that petitioner's amenability to voluntary treatment was irrelevant and should be ignored. See People v. Milinich, 2005 Cal. App. Unpub. LEXIS 8661, at *28. After all, the prosecutor's and defense counsel's arguments regarding petitioner's willingness to follow through with community-based treatment strongly suggest that the jury did not arrive at its verdict without first considering the large body of evidence presented of petitioner's willingness to undergo treatment if released into the community. See Middleton v. McNeil, 541 U.S. 433, 438 (2004) (arguments of counsel may clarify effect of jury instructions). Petitioner is not entitled to federal habeas relief on his instructional error claim. See 28 U.S.C. § 2254(d).

    2.    <u>Burden of proof claim</u>

Involuntary commitment statutes have been upheld when "(1) the confinement takes place pursuant to proper procedures and evidentiary standards, (2) there is a finding of dangerousness either to one's self or to others, and (3) proof of dangerousness is coupled with the proof of some additional factor, such as a mental illness or mental abnormality." Kansas v. Crane, 534 U.S. 407, 409-10 (2002) (internal quotation marks and ellipsis omitted). The legal definitions of "mental illness" or "mental abnormality" used in a civil commitment statute need not mirror those advanced by the medical profession. Kansas v. Hendricks, 521 U.S. 346, 359 (1997).

In the sex offender context, Hendricks does not require "<u>total</u> or <u>complete</u> lack of control," but nevertheless "there must be proof of serious difficulty in controlling behavior . . . [in order] to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." Crane, 534 U.S. at 411-13 (emphasis in original).

Here, the jury was instructed with California's standard SVPA instructions and, because petitioner introduced evidence that he was willing to undergo voluntary treatment

in the community, the jury was specifically told that, in considering the seriousness of any affliction that petitioner may suffer, and in considering the likelihood of future danger, petitioner's amenability to treatment, without custody, was a relevant factor.  The California Court of Appeal reasonably concluded that the instructions were legally sufficient and correct.  They did not withdraw from the jury any element required for involuntary civil commitment as an SVP.  Cf. Rose v. Mayberg, 454 F.3d 958, 962-63 (9th Cir. 2006) (allowing civil commitment pursuant to California's SVPA, not based on the offender's complete inability to control his behavior, but rather based on a "mental disorder" that "affected his emotional or volitional capacity" and "predisposes" him to commit further sexual crimes, is an objectively reasonable application of Crane and Hendricks).  Nor did they dilute the requisite state's burden of proving all the elements of civil commitment by clear and convincing evidence.  See Foucha v. Louisiana, 504 U.S. 71, 80 (1992) (state may confine mentally ill person if it shows by clear and convincing evidence that person is mentally ill and dangerous).  The instructions given, like the ones approved in Hendricks, held the jury to the more demanding standard of proof beyond a reasonable doubt.  See Cal. Welf. & Inst. Code § 6604; CALJIC No. 4.19.  Petitioner is not entitled to federal habeas relief on his burden of proof claim.  See 28 U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk shall enter judgment in favor of respondent, terminate all motions as moot and close the file.

SO ORDERED.

DATED:  August 03, 2007

CHARLES R. BREYER
United States District Judge

13